## IN RE: THE MARRIAGE OF STERN
### Case No. 64C-4751-FC (05)
Eleventh Judicial Circuit, Dade County
July 5, 1989

## OPINION OF THE COURT

JON I. GORDON, Circuit Judge.

### FINAL ORDER CANCELLING ARREARAGES AND TERMINATING ALIMONY

THIS MATTER came on for trial on June 13, 14 and 15, 1989. The Petitioner, Ex-Wife, MARTINA PRECIADO STERN (hereinafter referred to as "MARTINA") seeks to have unpaid child support and alimony reduced to judgment and enforced against the Respondent, her Ex-Husband, DAVID SACHS STERN (hereinafter referred to as "DAVID"). DAVID answered with affirmatives defenses, including parental alienation, laches, estoppel and reprehensible conduct on the

part of MARTINA. DAVID also counterpetitioned for the termination of MARTINA's alimony rights.

## FINDINGS OF FACT

1. The parties were married August 11, 1941. They separated in 1963, after nearly twenty-two (22) years of marriage. A Final Decree of Divorce incorporating the parties' Property Settlement Agreement, was granted June 22, 1965 in this same action in Dade County, Florida. MARTINA received custody of the three (3) minor children, who were of the following ages at the time of the divorce:

MARY ELIZABETH, fifteen (15) years of age;

ROBERT CHARLES, thirteen (13) years of age;

ANNA MARIE, three and one-half (3½) years of age.

Another son, DAVID PRECIADO, was twenty-five (25) years of age at the time of the parties' divorce.[1]

2. MARTINA remained in Miami, Florida with the children. DAVID, a law professor, pursued teaching positions at various universities and even tried opening his own law practice. Occasionally between jobs, DAVID relied upon loans from his mother, Florence Lemon. In 1974, DAVID accepted the position of Associate Dean at Lewis University College of Law in Illinois. DAVID remained with the institution until he retired and moved to Florida in 1985. DAVID's mother, Florence Lemon died April 11, 1986 in New York. She left a Five Thousand Dollars ($5,000.00) bequest to each of the STERN children. DAVID, as executor, had correspondence sent to MARTINA's address in Miami in an effort to locate and advise the children of their bequest. After MARTINA learned that DAVID had received an inheritance from his mother, she filed this action in March, 1988.

3. Pursuant to the Property Settlement Agreement, DAVID was obligated to pay monthly child support and alimony,[2] but was re-

---

[1] MARTINA was previously married and had one son, DAVID PRECIADO, who was adopted by the Respondent shortly following the marriage of MARTINA and the Respondent.

[2] DAVID was obligated to pay minimum monthly child support of One Hundred and No/100 Dollars ($100.00) per child until each child reached twenty-five (25) years of age or completed post-graduate education. Additionally, DAVID was to pay alimony to MARTINA commencing upon the first child completing post-graduate education or reaching twenty-five (25) years of age. The alimony was to be a minimum of Two Hundred and No/100 Dollars ($200.00) per month and not exceed a maximum of Three Hundred Fifty and No/100 Dollars ($350.00) per month until the death or remarriage of MARTINA.

stricted to visitation with the minor children at Canterbury House on the University of Miami campus. MARTINA insisted upon this restriction without justifiable cause. It is manifest to the Court, from the testimony and reasonable inferences therefrom that this visitation restriction was a reflection of MARTINA's animosity toward DAVID, calculated to construct a "barrier" between DAVID and his children.

4. DAVID sent some, but not all, support payments for two (2) years following the divorce. Thereafter, it is admitted that DAVID ceased all payment commencing January, 1968. MARTINA filed one (1) URESA Petition through the State Attorney's Office, Dade County, Florida, in January of 1966.

This action was transmitted to the State of Washington where DAVID then resided. Apparently, after some communications between DAVID and the Prosecuting Attorney's office in Washington, the URESA Petition was subsequently dismissed. Even though MARTINA knew, or had the opportunity to discover DAVID's whereabouts at all times material to this action, she did not institute further enforcement proceedings until this action was commenced March 18, 1988.[3]

5. Immediately following the divorce, DAVID attempted to maintain contact with the children, but was blocked in his attempts by MARTINA and her influence over the children. DAVID testified that his letter to the children were returned unopened. In describing MARTINA's attitude toward DAVID after the divorce, Professor Clifford Alloway (a friend of both parties and a godfather to the youngest son, ROBERT CHARLES), testified: "MARTINA was furious, probably madder than any woman I have ever seen." Harriet French, godmother to the oldest daughter, MARY ELIZABETH, would personally carry gifts from DAVID to the children. These gifts were summarily rejected. MARTINA gave them away! Harriet French would advise DAVID of the children's welfare after her visits with them. In one such letter to DAVID, Harriet French advised him that it was foolish, under the circumstances, for him to try to keep up any personal contact with his children.

6. Over several years, DAVID attempted without success to renegotiate the Property Settlement Agreement in order to secure visitation with the children. His efforts encountered resistance and indifference. MARTINA testified that upon her receiving legal documents from

---

[3] In 1975, MARTINA knew DAVID was teaching at Lewis University College of Law in Illinois. Apparently, she initially retained a private law firm in Illinois, but never filed any action against DAVID even though he remained with the University for another ten (10) years until his retirement in 1985.

DAVID's attorney, she didn't bother to read them, she just pitched them into the trash.

7. MARTINA admitted that she never encouraged the children to maintain contact with their father. She never encouraged any of the children to write a letter or place a phone call to DAVID. On the contrary, there is substantial evidence to conclude that MARTINA *discouraged* any relationship between the children and DAVID. For example, the eldest son, DAVID PREDIADO, testified that his mother, MARTINA, gave him a choice: he could continue his relationship with his father's mother (paternal grandmother, Florence Lemon) or he could be part of the family, a family which did not include his father or his father's mother. The testimony of MARY ELIZABETH, who appeared at trial, the videotape depositions of ANNA MARIE and DAVID, and the deposition transcript of ROBERT CHARLES, dramatically manifest that these children, raised to adulthood by MARTINA, are devoid of any feelings for their father. The expert witness in this case, Dr. Eli Levy, testified that these now-adult STERN children are suffering from "Parental Alienation Syndrome,"[4] a negative and lasting emotional impact as a result of the denial of a basic psychological need during their childhood, that of a relationship with their father. Dr. Levy stated:

> "They are relatively withdrawn people who are generally negative in their attitude. They are difficult. The reasons they are difficult is because they are very defensive and their defensiveness is not because they are bad people, but because they are generally insecure and inadequate."

Dr. Levy concluded that the children were raised under the influence of parental alienation, which he described as negative messages from the mother to these children with the goal to remove or to destroy any relationship with the father.

8. MARTINA is sixty-seven (67) years of age, has never remarried, and has approximately $160,000.00 in liquid assets. She holds a one-half (½) interest in the home in Mexico[5] from which she receives

---

[4] Dr. Levy testified to his familiarity with the concept of "parental alienation" as defined by Dr. Richard A. Gardner in his book *"The Parental Alienation Syndrome and the Differentiation Between Fabricated and Genuine Sex Abuse."* Dr. Levy identified Dr. Gardner as the nation's leading psychiatrist in child custody cases involving the concept of parental alienation.

[5] Ownership of the parties' home in Mexico is not now determined by this Court, and the ownership thereof may remain an issue as there is no transfer or distribution of the interest of either party under the Final Decree of Divorce nor mention of same in the Property Settlement Agreement.

rental income. She also receives social security payments and a monthly salary from her retirement plan with Burger King Corporation. She has sufficient assets and income to enable her to live suitably without necessity of alimony from DAVID.

9. DAVID is sixty-nine (69) years old, has remarried, is retired from his teaching profession and has no income other than that generated as interest through an inheritance from his mother.

10. The children, being adults, are not legally dependent upon either party.

## CONCLUSIONS OF LAW

While it is generally true that an ex-wife has a vested right to enforce collection of unpaid child support and alimony arrearages from a defaulting ex-husband, there are recognized exceptions wherein extraordinary or compelling circumstances justify the denial of arrearage enforcement. *Hurst v Hampton,* 274 So.2d 891 (Fla. 4th DCA 1973); *Tetta v Tetta,* 297 So.2d 642 (Fla. 1st DCA 1974); *Panganiban v Panganiban,* 396 So.2d 1156 (Fla. 2d DCA 1981); *State Department of Health v Candy,* 473 So.2d 273 (Fla. 2d DCA 1985); *Ashe v Ashe,* 509 So.2d 1146 (Fla. 1st DCA 1987).

In the facts before this Court, it is crystal clear that MARTINA, by her actions, words, deeds and attitudes alienated the minor children from their father. Such alienation constitutes sufficiently compelling circumstances to deny enforcement of arrearages for support and alimony payments. In *Craig v Craig,* 26 So.2d 881 (Fla. 1946), the Florida Supreme Court gave early recognition to the legal sufficiency of parental alienation as a defense to estop an ex-wife from collecting alimony. In that case, involving two children about eighteen (18) years old, it was alleged that the ex-wife (because of animosity for her ex-husband) had deliberately and maliciously denied her ex-husband visitation rights to the children, and that by her conduct, she "had been successful in the permanent alienation of their affection for their father . . ." (at page 883). Recently, in the case of *Hoffman v Foley,* 14 FLW 848, decided April 4, 1989, the Third District Court of Appeals reasoned there was implicit harm and prejudice to a father by depriving him of contact with his children, and that a custodial mother's misconduct in concealing the children's whereabouts from the father estopped her from recovery of support arrearages during the period of concealment. Although MARTINA did not conceal the children's whereabouts, she did engage in misconduct which has permanently alienated these children from DAVID. As a result,

DAVID has been prejudiced. He has lost that which can never be recovered, a loving relationship with his children.

Further, in *Gardner v Gardner,* 494 So.2d 500 (Fla. 4th DCA 1986), an ex-wife was barred, not only from collecting alimony arrearages, but also from collecting *current* alimony until she took steps to encourage visitation and to nurture the relationship between the child and father. MARTINA discouraged any relationship between these children and DAVID. This Court finds manifestation of a disorder in these now-adult children, which disorder is known as "Parental Alienation Syndrome." As a custodial parent, with greater influence and control over the children, MARTINA had an affirmative legal obligation (independent of DAVID's duty to support) to encourage a loving relationship between the children and their father. As to this legal obligation, she has failed miserably.

In the case of *In Re Adoption of Braithwaite,* 409 So.2d 1178 (Fla. 5th DCA 1982), the Court, citing U. S. Supreme Court decisions, recognized that the relationship between a parent and child has been determined to be constitutionally protected. It is the mandate of every trial judge to protect the children's right to a relationship with both parents. Unfortunately, the case sub judice comes too late to protect the STERN childrens' right. The children of this divorce are now all adults whose lives have been negatively impacted by the lack of a sense of love and identity with their father. This denial, perpetrated upon them without right by their mother, constitutes reprehensible conduct on the part of this custodial parent.

In addition to the foregoing compelling circumstances, there is no justification to excuse MARTINA's delay of 22 years in bringing this action. MARTINA instituted only one (1) previous action against DAVID, that being a URESA Petition in 1966. She made no formal demand on DAVID after that time; in fact, she refused to communicate with him. Although MARTINA professed that she did not always know the whereabouts of DAVID, it is clear to this Court that she had the means to know and had the ability to bring an enforcement action for years prior to this time.

It has been recognized in Florida that the affirmative defense of laches applies to proceedings to enforce payment of arrears of alimony or child support. Unexplained and unexcused delay for an unreasonable length of time may constitute such laches as will forfeit an ex-wife's right to enforcement of alimony arrearages. *Blocker v Ferguson,* 47 So.2d 694 (Fla. 1950). Delay in the presence of extraordinary facts or compelling circumstances may also constitute such laches as to bar

206

enforcement of child support arrearages where the child's welfare is not jeopardized. *Robinson v State Department of Health and Rehabilitation,* 473 So.2d 228 (Fla. 5th DCA 1985). All of the STERN children are adults, financially independent of their parents, and their welfare will not be jeopardized by the denial of relief to MARTINA.

DAVID, who has remarried, retired and is unemployed, would be prejudiced by enforcement of past due alimony and child support. More significantly, DAVID has been irremediably prejudiced by the denial of any relationship with his own children. These children, raised by MARTINA subsequent to the divorce, manifest no desire or even curiosity to know their father.

Upon considering all of the testimony, the exhibits submitted into evidence, the proffers, and the argument of counsel, this Court finds the defenses of parental alienation, estoppel, reprehensible conduct and laches have been overwhelmingly proven and constitute sufficient compelling circumstances and extraordinary facts to justify and even require that this Court cancel all child support and alimony arrearages, and terminate prospective alimony with prejudice to the Petitioner, MARTINA STERN, and therefore, it is

ADJUDGED:

1. That Petitioner's Petition for Order Establishing Alimony and Child Support Arrearages be, and the same is hereby, denied with prejudice, and Petitioner is forever foreclosed from recovery of any of the claimed arrearages from Respondent.

2. That the Respondent's Counterpetition for Modification of Alimony Payments be, and the same is hereby, granted and all alimony rights of Petitioner are hereby forever terminated.

3. That Petitioner's prayer to assess her attorney's fees against Respondent be, and the same is hereby, denied.

4. That costs will be assessed against the Petitioner upon proper motion.

DONE and ORDERED in Miami, Dade County, Florida, this 5th day of July, 1989.